UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AIRBORNE SAN DIEGO, LLC, a California limited liability company; and SUNCOAST FINANCIAL MORTGAGE CORPORATION, a California corporation,<br><br>                              Plaintiffs,<br><br>v.<br><br>TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, a Connecticut corporation,<br><br>                              Defendant. | Case No.:  19-cv-899-WQH-AHG<br><br>**ORDER** |

HAYES, Judge:

The matters before the Court are the Motion for Summary Judgment, or Alternatively, Partial Summary Judgment filed by Defendant Travelers Property Casualty Company of America (ECF No. 31) and the Motion for Partial Summary Judgment filed by Plaintiffs Airborne San Diego, LLC, and Suncoast Financial Mortgage Corporation (ECF No. 38).

///

1

## I.   BACKGROUND

On May 13, 2019, Plaintiffs Airborne San Diego, LLC ("Airborne") and Suncoast Financial Mortgage Corporation ("Suncoast") filed a Complaint against Defendant Travelers Property Casualty Company of America ("Travelers"). (ECF No. 1). On November 5, 2019, Plaintiffs filed a First Amended Complaint ("FAC"). (ECF No. 15).

Plaintiffs allege that they are the primary and additional insureds on a custom insurance policy issued by Defendant Travelers. Plaintiffs allege that on December 7, 2016, at Airborne's indoor skydiving facility there was a breakdown of turning vane equipment in the wind tunnel above the flight chamber, causing more than $1,000,000 in property damage. Plaintiffs allege that in June 2017, the nose cone in the wind tunnel "catastrophically failed, coming off and blowing apart," and damaging the fan blades and parts of the tunnel superstructure. (*Id.* ¶ 48). Plaintiffs allege that the Travelers insurance policy covers property damage and loss of business income caused by the turning vane failure and the nose cone failure. Plaintiffs allege that Travelers repeatedly denied and underpaid policy benefits, contributing to the demise of Airborne's business. Plaintiffs bring the following claims against Travelers: 1) breach of insurance contract; and 2) breach of the implied covenant of good faith and fair dealing. Plaintiffs seek damages, including punitive damages, statutory penalties, and attorneys' fees and costs.

On November 19, 2019, Travelers filed an Answer to the FAC. (ECF No. 18).

The parties engaged in fact discovery.

On November 12, 2020, Travelers filed a Motion for Summary Judgment, or Alternatively, Partial Summary Judgment. (ECF No. 31). Travelers moves for summary judgment on both of Plaintiffs' claims. In the alternative, Travelers moves for partial summary judgment on the grounds that there is no coverage for the turning vane claim, the genuine dispute doctrine precludes liability for breach of the implied covenant of good faith and fair dealing, and Plaintiffs fail to come forward with evidence sufficient to entitle Plaintiffs to an award of punitive damages. On December 7, 2020, Plaintiffs filed an

Opposition to Travelers' Motion for Summary Judgment. (ECF No. 32). On December 14, 2020, Travelers filed a Reply. (ECF No. 33).

On January 29, 2021, Plaintiffs filed a Motion for Partial Summary Judgment. (ECF No. 38). Plaintiffs move for partial summary judgment on the grounds that there is coverage for the turning vane claim, Travelers waived any policy requirement for notice and proof of loss, Travelers is liable for breach of the implied covenant of good faith and fair dealing as a matter of law, and the genuine dispute doctrine is "unavailable." (*Id.* at 2). On February 22, 2021, Travelers filed an Opposition to Plaintiffs' Motion for Partial Summary Judgment. (ECF No. 40). On March 2, 2021, Plaintiffs filed a Reply. (ECF No. 41).

On March 11, 2021, the Court heard oral argument on the Motions for Summary Judgment. (ECF No. 42).

## II. FACTS[1]

Plaintiff Airborne owned and operated an indoor skydiving facility in downtown San Diego. Construction of the facility was financed in part by Plaintiff Suncoast. Defendant Travelers "issued insurance policy no. BME1-9H131195-TIL-16 to Airborne for the period of November 14, 2016 to November 14, 2017" ("Policy"). (Def.'s Statement of Undisputed Material Facts ("Def.'s SUMF"), ECF No. 31-1 ¶ 1). Suncoast has an "insurable interest" under the Policy as a "Loss Payee." (Endorsement, Ex. D to Fink Decl., ECF No. 32-1 at 82-83). "The Policy provides Equipment Breakdown Protection," including coverage for property damage and business income loss. (Def.'s SUMF, ECF No. 31-1 ¶ 3).

---

[1] Travelers filed evidentiary objections. (ECF Nos. 33-2, 40-2). The relevance objections to evidentiary materials cited in this Order are overruled. The objections to evidentiary materials not cited in this Order are denied as moot. *See Sandoval v. Cty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) ("[I]f evidence submitted on summary judgment could create a genuine dispute of material fact, it is, by definition, 'of consequence in determining the action,' and therefore relevant. Conversely, if the submitted evidence does not create a genuine dispute of material fact, there is no need for the court to separately determine whether it is relevant because, even assuming it is not, it will not affect the ultimate summary judgment ruling." (quoting Fed. R. Evid. 401)).

The Policy has a coverage limit for property damage of $28,732,645 per "Breakdown." (Policy, Ex A. to Litke Decl., ECF No. 31-2 at 22). To qualify for coverage, there must be a "Breakdown" or failure of "Covered Equipment," in addition to other requirements. (*Id.* at 28). Covered Equipment includes "internal pressure or vacuum" equipment and "electrical or mechanical equipment that is used in the generation, transmission or utilization of energy." (*Id.* at 47). Covered Equipment does not include any "non-metal part or any part or tool subject to periodic replacement." (*Id.* at 48).

The Policy has a coverage limit for business income loss of $2,400,000 per Breakdown. (*Id.* at 22). The Policy covers actual loss of "Business Income" during the "Period of Restoration"—the period from the date of the Breakdown to thirty days after the damaged property should have reasonably been repaired or replaced. (*Id.* at 28). "Business Income" is net income that would have been earned and normal operating expenses that would have been incurred. (*Id.* at 47).

In December 2016, Airborne was preparing to open its facility. The facility had two vertical wind tunnels to simulate a skydiving experience. The wind tunnels used large fans to move air at a high speed. The fans were "capped with an aerodynamic fiberglass nose-cone to direct airflow past the fan blade and motor assembly." (Pls.' Additional Undisputed Material Facts ("Pls.' AUMF"), ECF No. 32-3 ¶ 66). In each corner of the tunnels, there was a turning vane "made of fiberglass attached to the walls with metal pins." (*Id.* ¶ 65). "The turning vanes were essentially curved, wing-like foils used to bend the airflow through the corners" and "remove turbulence." (Def.'s SUMF, ECF No. 31-1 ¶ 9; Pls.' AUMF, ECF No. 32-3 ¶ 64).

"On December 7, 2016, while wind tunnel 1 was engaged in a testing operation, the turning vanes above the flight chamber broke apart," sending "pieces of shrapnel and materials back through the fan, and dust and debris back into the flight chamber." (Pls.' AUMF, ECF No. 32-3 ¶¶ 70-71). "Tunnel 1 had to be shut down, recommissioned, tested and repaired as a result of the turning vane failure." (*Id.* ¶ 75).

"On June 14, 2017, the fiberglass nose cone in Tunnel 1 failed. The nose cone dislodged from the top of the fan blade while the tunnel was in operation causing damage that shut down the tunnel chamber." (*Id.* ¶ 106).

On June 29, 2017, Airborne tendered a claim for Policy benefits to Travelers for the nose cone failure ("Nose Cone Claim").[2] Airborne reported that its business had opened in June 2017. On August 11, 2017, Airborne sent Travelers financial records and business projections. On September 19, 2017, Travelers agreed to retain a forensic accounting firm to evaluate Airborne's lost business income from the nose cone failure. Airborne was in financial distress and requested that Travelers "bring [Airborne's] interruption payment current" so Airborne could pay its creditors. (Ex. 99 to Litke Dep., ECF No. 32-2 at 275). Travelers did not make any payment in response to Airborne's request. In late September 2017, Airborne closed its business, and Suncoast acquired an interest in Airborne's insurance claims through a settlement agreement.

Travelers requested additional accounting records on the business income loss portion of the Nose Cone Claim. On March 8, 2018, Suncoast sent Travelers a report prepared by its forensic accounting firm, concluding that Airborne's lost business income for a period of thirteen months was $4,487,992. In calculating lost business income, the accounting firm included lost military sales and did not subtract depreciation from Airborne's normal operating expenses.

In April 2018, Suncoast sent Travelers additional accounting records. On May 14, 2018, Travelers' forensic accounting firm concluded that Airborne's lost business income for a period of twelve months was $427,603. In calculating lost business income, the accounting firm subtracted depreciation as a saved operating expense. On June 18, 2018, Travelers paid $427,597 for the business income loss portion of the Nose Cone Claim after

---

[2] On November 14, 2017, the parties reached an agreement to settle the property damage portion of the Nose Cone Claim for $3,438,900. "Plaintiffs have released Travelers from all claims relating to property damage arising out of the [n]ose [c]one [failure]." (Def.'s SUMF, ECF No. 31-1 ¶ 52). Business income loss is the only portion of the Nose Cone Claim at issue on summary judgment.

adjusting the accountant's figure "to account for the average daily value of the Policy's deductible." (Def.'s SUMF, ECF No. 31-1 ¶ 27).

Suncoast challenged Travelers' determination of Airborne's lost business income. Travelers hired a second forensic accounting firm, and Suncoast provided a second report from its forensic accountant. On August 16, 2018, Travelers' second accounting firm concluded that "Airborne's projected business income loss for 12 months totals $496,704"—$69,107 more than the amount Travelers already paid. (*Id.* ¶ 32). "Travelers issued an additional payment totaling $69,107 for Airborne's business income loss claim on August 22, 2018." (*Id.* ¶ 34).

On November 7, 2018, Plaintiffs' attorney requested resolution of the business income loss portion of the Nose Cone Claim via appraisal, and Travelers agreed. The appraisal proceeding lasted several months. On July 31, 2019, the appraisers executed an Appraisal Award in the amount of $1,903,296—the remainder of the Policy's $2,400,000 business income loss limit. The Appraisal Award included lost military sales and did not subtract depreciation from Airborne's normal operating expenses. "Travelers timely paid the Appraisal Award on August 12, 2019." (*Id.* ¶ 38).

On November 7, 2018, Plaintiffs tendered a claim for Policy benefits to Travelers for the turning vane failure that had occurred on December 7, 2016 ("Turning Vane Claim"). Plaintiffs provided Travelers with a report from Taquino Engineering ("Taquino Report"), which investigated the cause of the turning vane failure for Airborne. The Taquino Report concluded that the turning vane failure was caused by inconsistent adhesive bond throughout the fiberglass turning vanes and weak positioning of the tape reinforcing the edge of vanes. (Taquino Report, Ex. 13 to Litke Decl, ECF No. 31-2 at 140-41). The Taquino Report concluded that "these design and assembly-related problems" caused cracking of the lead edge joint under aerodynamic loads, which allowed air to enter the vane and caused the skin section to peel away from the end caps. (*Id.* at 141).

On April 17, 2019, Travelers denied coverage of the Turning Vane Claim on the grounds that "[t]he vanes are made of composite material that is non-metal[,] [and] . . .

non-metal parts . . . are not Covered Equipment[.]" (Ex. 18 to Litke Decl., ECF No. 31-2 at 166).[3]

## III.   LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). Where the party moving for summary judgment bears the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) (citation omitted). Where the party moving for summary judgment does not bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see also United Steelworkers v. Phelps Dodge*

---

[3] Travelers requests that the Court take judicial notice of the FAC filed in this case. (ECF No. 31 at 12 n.3). Travelers further requests that the Court take judicial notice of the second amended complaint and the register of actions in *Airborne America, Inc., et al. v. Kenway Composites, et al.*, Case No. 37-3018-00061371-CU-BT-CTL (S.D. Super. Ct.). (ECF No. 40-4). Judicial notice of the requested documents is unnecessary for this Order. Travelers' requests for judicial notice are denied. *See Asvesta v. Petroutsas*, 580 F.3d 1000, 1010 n.12 (9th Cir. 2009) (denying request for judicial notice where judicial notice would be "unnecessary").

*Corp.*, 865 F.2d 1539, 1542-43 (9th Cir. 1989) ("[O]n an issue where the plaintiff has the burden of proof, the defendant may move for summary judgment by pointing to the absence of facts to support the plaintiff's claim. The defendant is not required to produce evidence showing the absence of a genuine issue of material fact with respect to an issue where the plaintiff has the burden of proof. Nor does Rule 56(c) require that the moving party support its motion with affidavits or other similar materials negating the nonmoving party's claim." (citations omitted)).

If the moving party meets the initial burden, the burden shifts to the opposing party to show that summary judgment is not appropriate. *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 322, 324. The nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient."). The nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (citations omitted). The nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *See Anderson*, 477 U.S. at 256.

## IV.   FIRST CLAIM – BREACH OF INSURANCE CONTRACT

Travelers moves for summary judgment on the first claim for breach of insurance contract. In the alternative, Travelers moves for partial summary judgment on the following grounds: 1) there is no coverage for the Turning Vane Claim because the Turning Vane Claim did not result from a Breakdown of Covered Equipment; and 2) there is no coverage for the Turning Vane Claim because Airborne breached the loss conditions of the Policy. Plaintiffs move for partial summary judgment on the following grounds: 1) there is coverage for the Turning Vane Claim; and 2) Travelers waived any Policy requirement for notice and proof of loss.

1        Travelers contends that the Turning Vane Claim is not covered by the Policy because "the turning vanes are not made of metal and are therefore not [C]overed [E]quipment." (ECF No. 31 at 17). Travelers contends that the Policy excludes "any non-metal part" from the definition of Covered Equipment. (*Id.* at 18 (emphasis omitted)). Travelers contends that the turning vanes are made of fiberglass, and "the turning vanes themselves failed, not the pins or metal corner boxes that affixed the vanes to the walls of the wind tunnels." (*Id.* at 19). Travelers contends that Airborne breached the loss conditions of the Policy by failing to tender the Turning Vane Claim until two years after the loss occurred and by making repairs before Travelers could investigate the cause of loss.

        Plaintiffs contend that the turning vanes are Covered Equipment, and the Turning Vain Claim is covered by the Policy. Plaintiffs contend that the "non-metal part" exclusion applies to parts that are "subject to periodic replacement." (ECF No. 32 at 17 (emphasis omitted)). Plaintiffs contend that "[t]he 'non-metal part' exclusion does not apply as the turning vanes are permanently installed equipment . . . ." (*Id.*). Plaintiffs contend that Travelers' interpretation of the exclusion "renders much of the paragraph superfluous and redundant." (*Id.* at 18). Plaintiffs contend that Airborne complied with all loss conditions, and Travelers was not prejudiced by any breach. Plaintiffs contend that Travelers waived the requirements of the loss conditions by denying coverage of the Turning Vane Claim on other grounds.

        Under California law, the elements of a cause of action for breach of contract are: "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff therefrom." *Wall St. Network, Ltd. v. N.Y. Times Co.*, 164 Cal. App. 4th 1171, 1178 (2008) (citation omitted). Federal courts apply state law to interpret an insurance policy. *See Travelers Prop. Cas. Co. of Am. v. ConocoPhillips Co.*, 546 F.3d 1142, 1145 (9th Cir. 2008) (citing *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008)). "[I]nterpretation of an insurance policy is a question of law." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995) (citing *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 818 (1990)), *as modified on denial of reh'g* (Oct. 26, 1995).

19-cv-899-WQH-AHG

"The ordinary rules of contract interpretation apply equally to contracts of insurance." *Am. Alt. Ins. Corp. v. Superior Court*, 135 Cal. App. 4th 1239, 1245 (2006) (citing *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 1115 (1999)). "The mutual intention of the contracting parties at the time the contract was formed governs." *Id.* (citing Cal. Civ. Code § 1636; *Palmer*, 21 Cal. 4th at 1115). Courts "read a contract as a whole in order to 'give effect to every part, if reasonably practicable, each clause helping to interpret the other.'" *Van Ness v. Blue Cross of Cal.*, 87 Cal. App. 4th 364, 372 (quoting Cal. Civ. Code § 1641). "In construing the language of an insurance policy, a court should give the words used their plain and ordinary meaning, unless the policy clearly indicates to the contrary." *Giddings v. Indus. Indem. Co.*, 112 Cal. App. 3d 213, 218 (1980) (citations omitted). "Where contract language is clear and explicit and does not lead to an absurd result, [the court] ascertain[s] [the parties'] intent from the written provisions and go[es] no further." *Van Ness*, 87 Cal. App. 4th at 372 (citing Cal. Civ. Code §§ 1638, 1639; *AIU Ins.*, 51 Cal. 3d at 822); *see Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992) (if policy language is "clear and explicit, it governs").

"[I]nsurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured . . . ." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003) (citation omitted), *as modified on denial of reh'g* (Sept. 17, 2003). "[E]xclusionary clauses are interpreted against the insurer." *Id.* (citation omitted).

> [A]n insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear. As we have declared time and again any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect. Thus, the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language. The exclusionary clause must be conspicuous, plain and clear. This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded. The burden is on the insured to establish that the claim is within the basic scope of coverage and on the insurer to establish that the claim is specifically excluded.

*Id.* (emphasis omitted) (citations omitted).

In this case, the Policy provides that Travelers "will pay for direct damage caused by a 'Covered Cause of Loss' to 'Covered Property' located at the Covered Premises . . . ." (Policy, Ex. 1 to Litke Decl., ECF No. 31-2 at 28). A "'Covered Cause of Loss' is a 'Breakdown' to 'Covered Equipment' . . . ." (*Id.* at 28). A "Breakdown" includes "[f]ailure of pressure or vacuum equipment" or "[m]echanical failure including rupture or bursting caused by centrifugal force," which "causes physical damage to 'Covered Equipment' and necessitates its repair or replacement[.]" (*Id.* at 46-47).

"Covered Equipment" means any:

(1) Equipment designed and built to operate under internal pressure or vacuum other than weight of its contents; [or]
. . .
(4) Any other electrical or mechanical equipment that is used in the generation, transmission or utilization of energy.

(*Id.*).

Pursuant to the Policy's plain language, coverage is limited to damage caused by a Breakdown to Covered Equipment. The Policy excludes from the definition of Covered Equipment any

(5) Felt, wire, screen, mold, form, pattern, die, extrusion plate, swing hammer, grinding disc, cutting blade, non-electrical cable, chain, belt, rope, clutch plate, brake pad, non-metal part or any part or tool subject to periodic replacement[.]

(*Id.* at 48). Under the plain meaning of this exclusion, the phrase "subject to periodic replacement" modifies "any part or tool." The term "non-metal part" is not modified by the phrase "subject to periodic replacement." Any non-metal part is excluded, whether or not it is subject to periodic replacement. *See Renee J. v. Superior Court*, 26 Cal. 4th 735, 743 (2001) ("A longstanding rule of statutory construction—the last antecedent rule—provides that qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more

11

remote." (citing *White v. Cty. of Sacramento,* 31 Cal. 3d 676, 680 (1982))), *superseded by statute on other grounds as stated in In re Allison J.*, 190 Cal. App. 4th 1106 (2010).

Interpreting the exclusion consistent with the plain meaning "does not lead to an absurd result" in this case. *Van Ness*, 87 Cal. App. 4th at 372 (citations omitted). Excluding any non-metal part gives meaning to every word in the exclusion. Many of the excluded items preceding the term "non-metal part" are usually made of metal (e.g., swing hammer, cutting blade), and most if not all of the excluded items preceding the term "non-metal part" can be made of metal. Exclusion of "non-metal part[s]" differentiates items from those on the preceding list of excluded items. The final phrase "any part or tool subject to periodic replacement" excludes additional metal parts and tools and non-metal tools that are not previously excluded. *See Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation v. California*, 813 F.3d 1155, 1171 (9th Cir. 2015) ("An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable." (quoting 11 WILLISTON ON CONTRACTS § 32:5 (4th ed. 2015)).

The omission of a serial comma[4] to separate "non-metal part" from "any part or tool" does not affect the plain meaning of the exclusion. The Policy frequently omits the final comma in a series. *See, e.g.*, Policy, Ex. 1 to Litke Decl., ECF No. 31-2 at 30 ("[C]overage . . . will end once the other property is repaired, rebuilt or replaced."); *id.* at 47 ("'Computer Program' means a set of related electronic instructions . . . which enables the computer or device to receive, process, store, retrieve or send data."); *see United States v. Bass*, 404 U.S. 336, 340 n.6 (1971) ("[M]any leading grammarians, while sometimes noting that commas at the end of series can avoid ambiguity, concede that use of such commas is

---

[4] A serial comma is "a comma used to separate the second-to-last item in a list from a final item introduced by the conjunction *and* or *or*[.]" *Serial Comma*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/serial%20comma (last visited Mar. 22, 2021). The phrase "red, white, and blue" includes a serial comma. *Id.*

discretionary . . . . [W]e will not attach significance to an omitted comma." (citation omitted)).

Under Plaintiffs' interpretation of the exclusion, the phrase "subject to periodic replacement" modifies "non-metal part." Plaintiff's interpretation is contrary to the plain language of the exclusion and is not a reasonable construction. *See MacKinnon*, 31 Cal. 4th at 648 (a policy provision is ambiguous if it is capable of two or more *reasonable* constructions). Under Plaintiffs' interpretation, the exclusion is read to exclude "any *non-metal part* subject to periodic replacement" and "any *part* subject to periodic replacement." The term "non-metal part" becomes superfluous because any *non-metal part* subject to periodic replacement is a *part* subject to periodic replacement. *See Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 957 (2003) ("An interpretation rendering contract language nugatory or inoperative is disfavored." (citation omitted)). The exclusionary clause is "conspicuous, plain and clear." *MacKinnon*, 31 Cal. 4th at 648. Any non-metal part is excluded, whether or not it is subject to periodic replacement.

It is undisputed that on December 7, 2016, "the turning vanes above the flight chamber broke apart," sending shrapnel through the fan and requiring the shut down and repair of the wind tunnel. (Pls.' AUMF, ECF No. 32-3 ¶ 70). It is undisputed that the turning vanes "were made of fiberglass attached to the walls with metal pins." (*Id.* ¶ 65). The report prepared by Taquino Engineering on Airborne's behalf concluded that the "adhesive bond was not consistent throughout the vanes, leading to pre-installation edge delamination/failure." (Taquino Report, Ex. 13 to Litke Decl, ECF No. 31-2 at 140). The Taquino Report concluded that there was Kevlar tape attached to the leading edge of the turning vane to reinforce and protect it, but the tape ended "exactly where the top and bottom skins met, i.e, at the parting line[,] . . . leav[ing] the parting line vulnerable to both aerodynamic loads and impact damage." (*Id.* at 141). The Taquino Report concluded that "these design and assembly-related problems" caused cracking of the lead edge joint under aerodynamic loads, which allowed air to enter the vane and caused the skin section to peel

away from the end caps. (*Id.* at 142). Plaintiffs "adopted the Taquino [ ] [R]eport as an accurate description of the [t]urning [v]ane [failure] and cause of that [failure]," and Travelers relied on the Taquino Report in determining the cause of loss. (Def.'s SUMF, ECF No. 31-1 ¶ 49).

Based on the undisputed facts in this case, the fiberglass turning vane is the part that failed. The turning vanes are excluded from the definition of Covered Equipment as a non-metal part. The Turning Vane Claim is not covered by the Policy. Travelers' Motion for Summary Judgment on the first claim for breach of insurance contract is granted. Travelers' Motion for Partial Summary Judgment on the grounds that there is no coverage for the Turning Vane Claim because the Turning Vane Claim did not result from a Breakdown of Covered Equipment is denied as moot. Travelers' Motion for Partial Summary Judgment on the grounds that there is no coverage for the Turning Vane Claim because Airborne breached the loss conditions of the Policy is denied as moot. Plaintiffs' Motion for Partial Summary Judgment on the grounds that there is coverage for the Turning Vane Claim is denied. Plaintiffs' Motion for Partial Summary Judgment on the grounds that Travelers waived any Policy requirement for notice and proof of loss is denied as moot.

## V.   SECOND CLAIM – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING / BAD FAITH

Travelers moves for summary judgment on the second claim for breach of the implied covenant of good faith and fair dealing, which the parties refer to as "bad faith." (*See, e.g.*, ECF No. 31 at 2; ECF No. 38-1 at 24). In the alternative, Travelers moves for partial summary judgment on the following grounds: 1) Travelers is not liable for bad faith with respect to its handling of the Turning Vane Claim because there is a genuine issue as to coverage of the Turning Vane Claim; 2) Plaintiffs fail to come forward with evidence of oppression, fraud, or malice sufficient to entitle Plaintiffs to an award of punitive damages with respect to Travelers' handling of the Turning Vane Claim; 3) Travelers is not liable for bad faith with respect to its handling of the Nose Cone Claim because there was a genuine issue as the amount of lost business income recoverable; and 4) Plaintiffs fail to

come forward with evidence of oppression, fraud, or malice sufficient to entitle Plaintiffs to an award of punitive damages with respect to Travelers' handling of the Nose Cone Claim.

Plaintiffs move for partial summary judgment on the following grounds: 1) Travelers is liable for bad faith as a matter of law because it failed to thoroughly and objectively evaluate the Turning Vane Claim; 2) the genuine dispute doctrine is "unavailable" for Travelers' handling of the Turning Vane Claim; 3) Travelers is liable for bad faith as a matter of law because it failed to thoroughly and objectively evaluate the Nose Cone Claim; and 4) the genuine dispute doctrine is "unavailable" for Travelers' handling of the Nose Cone Claim. (ECF No. 38 at 2).

### a. <u>The Turning Vane Claim</u>

Travelers contends that it did not act in bad faith by denying coverage of the Turning Vane Claim because the Turning Vane Claim is not covered. Travelers contends that there is a genuine issue as to Travelers' liability under the Policy, which precludes a finding of bad faith. Plaintiffs contend that Travelers failed to thoroughly investigate the Turning Vane Claim. Plaintiffs contend that the genuine dispute doctrine does not apply because by failing to thoroughly investigate, Travelers deprived itself of the ability to fairly evaluate the Turning Vane Claim.

To succeed on a bad faith claim, the insured "must first demonstrate that there is in fact coverage under the policy. An insurer's failure to investigate . . . is *not* separately actionable if there is no coverage." *Jordan v. Allstate Ins. Co.*, 148 Cal. App. 4th 1062, 1078 (2007), *modified on denial of reh'g*, 2007 Cal. App. LEXIS 618 (Apr. 20, 2007). "[I]f there is no coverage, there can be no bad faith in refusing coverage." *Sony Comput. Entm't Am., Inc. v. Am. Home Assurance Co.*, 532 F.3d 1007, 1021 (9th Cir. 2008) (citing *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1152-53 (1990)). The Court has determined that Travelers is entitled to summary judgment on the first claim for breach of insurance contract because the Turning Vane Claim is not covered. Plaintiffs' Motion for Partial

Summary Judgment on the grounds that Travelers is liable for bad faith as a matter of law because it failed to thoroughly and objectively evaluate the Turning Vane Claim is denied.

### b.  The Nose Cone Claim

Plaintiffs contend that Travelers failed to follow its policy of advancing benefits and delayed paying benefits due on the business income loss portion of the Nose Cone Claim, causing Airborne to go out of business. Plaintiffs contend that that Travelers had the information needed to calculate Airborne's lost business income in August 2017, but Travelers did not "formally retain an accounting expert . . . until December 6, 2017," and no payment was made until a year after the date of loss. (ECF No. 32 at 27). Plaintiffs contend that Travelers failed to adequately investigate and evaluate Airborne's lost business income. Plaintiffs contend that Travelers wrongfully subtracted depreciation from the amount of lost business income as a saved operating expense. Plaintiffs contend that Travelers failed to consider evidence of lost military sales. Plaintiffs contend that the genuine dispute doctrine is unavailable because Travelers' accountants did not receive or review the Policy, so it was unreasonable for Travelers to rely on the accountants' calculation of business income loss.

Travelers contends that it was not required to advance benefits. Travelers contends that any delay was caused by Plaintiffs. Travelers contends that Plaintiffs "did not provide any actual accounting data (as opposed to projections)" until nine months after the date of loss. (ECF No. 33 at 11). Travelers contends that there was a genuine dispute as to the amount of lost business income payable under the Policy. Travelers contends that it was reasonable to subtract depreciation from the amount of lost business income as a saved operating expense. Travelers contends that Airborne did not provide any evidence of military contracts. Travelers contends that it reasonably relied on its experts and included all relevant information in calculating Airborne's lost business income.

"[There] is an implied covenant of good faith and fair dealing in every contract [including insurance policies] that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Gruenberg v. Aetna Ins. Co.*, 9 Cal.

3d 566, 573 (1973) (alterations in original) (quoting *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal. 2d 654, 658 (1958)). "For the insurer to fulfill its obligation not to impair the right of the insured to receive the benefits of the agreement, it [ ] must give at least as much consideration to the [insured]'s interests as it does to its own." *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 818-19 (1979) (citing *Silberg v. Cal. Life Ins. Co.*, 11 Cal. 3d 452, 460 (1974)).

To establish a breach of the implied covenant of good faith and fair dealing, the plaintiff must show that the insurer withheld benefits due under the policy, and the reason for withholding was unreasonable or without proper cause. *See Love*, 221 Cal. App. 3d at 1151; *see also Gruenberg*, 9 Cal. 3d at 575 ("[W]hen the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability . . . ."). "[A]n insurer's bad judgment or negligence is insufficient to establish bad faith; instead, the insurer must engage in a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." *Nieto v. Blue Shield of Cal. Life & Health Ins. Co.*, 181 Cal. App. 4th 60, 86 (2010) (quoting *Chateau Chamberay Homeowners Assn. v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 346 (2001)). "The ultimate test is whether the insurer's conduct was reasonable." *Id.* (citing *Chateau Chamberay*, 90 Cal. App. 4th at 346).

In general, the reasonableness of an insurer's claims-handling conduct is a question of fact to be determined by a jury. *See Chateau Chamberay*, 90 Cal. App. 4th at 346. An insurer's bad faith becomes a question of law "when, because there are no conflicting inferences, reasonable minds could not differ." *Id.* at 350.

In this case, the Policy provides that Travelers will pay Airborne's "actual loss of 'Business Income' from a total or partial interruption of business during the 'Period of Restoration' . . . ," up to a limit of $2,400,000 per Breakdown. (Policy, Ex A. to Litke Decl., ECF No. 31-2 at 28).

"Business Income" means the:

a. Net income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

b. Continuing normal operating expenses incurred, including "Ordinary Payroll."

(*Id.* at 47). The "Period of Restoration" is the period that begins at the time of the Breakdown and ends thirty days after the property "should be repaired, rebuilt or replaced with reasonable speed and similar quality[.]" (*Id.* at 22, 47). The Policy provides that Travelers "will take into consideration: (1) The experience of your business before the 'Breakdown' and the probable experience you would have had without the 'Breakdown' . . . in the adjustment of any loss." (*Id.* at 28-29).

Airborne opened its business in June 2017. "On June 14, 2017, the fiberglass nose cone in Tunnel 1 . . . dislodged from the top of the fan blade while the tunnel was in operation causing damage that shut down the tunnel chamber." (Pls.' AUMF, ECF No. 32-3 ¶ 106). On June 29, 2017, Airborne tendered the Nose Cone Claim to Travelers. On August 11, 2017, Airborne sent Travelers a financial analysis, market analysis, marketing plan, sales revenue projections and forecasts, and profit and loss statements from May, June, and July 2017. (*See* Ex. 90 to Litke Dep., ECF No. 32-2 at 261-266). On August 18, 2017, Travelers confirmed that the Nose Cone Claim is covered.[5] (*See* Ex. 86 to Litke Dep., Ex. 32-2 at 249).

On September 19, 2017, Travelers agreed to retain forensic accounting firm Morgan Johnson Carpenter & Co. ("MJC") to evaluate Airborne's lost business income. Airborne was in "financial distress." (Pls.' AUMF, ECF No. 32-3 ¶ 118). On September 20, 2017, Airborne requested that Travelers "bring [Airborne's] interruption payment current" so Airborne could pay its creditors. (Ex. 99 to Litke Dep., ECF No. 32-2 at 275). Adjuster Brian Litke testified at his deposition that it is Travelers' policy to issue advances on claims where coverage is accepted, including business interruption claims. (*See* Litke Dep., Ex. T

---

[5] At that time, Travelers was still reviewing whether damage to the fiberglass nose cone was covered in addition to damage to the fan caused by the nose cone failure.

to Buscemi Decl., ECF No. 32-2 at 72). However, Travelers did not make any payment or advance benefits in response to the request. In late September 2017, Airborne closed its business, and Suncoast acquired an interest in Airborne's insurance claims through a settlement agreement.

"By way of written communications dated October 9, 2017, October 22, 2017, November 6, 2017 and November 20, 2017," MJC—the forensic accounting firm retained by Travelers—"asked [Plaintiffs] for accounting records concerning Airborne's skydiving business, including profit/loss statements, a general ledger, bank statements, loan documents, sales tax reports and/or payroll records." (Def.'s SUMF, ECF No. 31-1 ¶ 17). Adjuster Litke's Claim Notes from November 14, 2017, state that "[Travelers] agreed with [Suncoast] that once the CPA has received the requested info on the RFI, and once [Travelers] can identify what, if any [business interruption] may have occurred, [Travelers] will present that to [Suncoast] for review so that [Travelers] may finalize [the business income loss portion of the Nose Cone Claim]." (Ex. 2 to Litke Decl., ECF No. 31-2 at 78).

On December 20, 2017, Suncoast sent an email to MJC, stating that "the requested information would be provided in a report all at once after the new year and that Suncoast has engaged an accounting firm to assist in compiling the requested information." (Def.'s SUMF, ECF No. 31-1 ¶ 19). On March 8, 2018, Suncoast sent Travelers a report prepared by Suncoast's forensic accountant, CBIZ ("CBIZ Report"). (*Id.* ¶ 20). The CBIZ Report concluded that Airborne's lost business income over thirteen months due to the nose cone failure was $4,487,992. CBIZ included military sales as lost business income and did not subtract depreciation as a saved operating expense.

On March 20, 2018, adjuster Litke notified Suncoast that MJC was reviewing the CBIZ Report, but the Period of Restoration was in dispute, the projections "appear to be overstated," and Travelers would "require additional information to allow the adjustment to move forward." (Ex. 6 to Litke Decl., ECF No. 31-2 at 108). On March 28, 2018, Litke notified Suncoast that MJC was "still waiting on the general ledger information from you . . . ." (Ex. 6 to Litke Decl., ECF No. 31-2 at 107). On April 4, 2018, Suncoast sent Travelers

a general accounting ledger. On April 5, 2018, the engineering firm that Travelers hired to investigate the nose cone failure concluded that repairs would take an estimated six months, and up to eight months. On April 26, 2018, Suncoast sent Travelers additional financial records, including an annual statement of deposits and filings.

On May 14, 2018, MJC provided a written report, concluding that Airborne's lost business income for a period of twelve months was $427,603. In calculating the amount of lost business income, MCJ subtracted depreciation of $67,500 per month from the amount of lost business income as a saved operating expense. On June 18, 2018, Travelers issued payment for the business income loss portion of the Nose Cone Claim totaling $427,597 after adjusting the accountant's figure "to account for the average daily value of the Policy's deductible." (Def.'s SUMF, ECF No. 31-1 ¶ 27).

Suncoast challenged Travelers' determination of Airborne's lost business income. Suncoast asserted that MJC inappropriately extrapolated daily sales figures, improperly subtracted depreciation from the amount of lost business income, and used an inadequate Period of Restoration. "As a result of the disagreement, [Travelers] hired another accounting [firm], . . . Matson Driscoll & Damico LLP ('Matson'), to review all the facts and information and render an opinion on the anticipated performance of the business for 12 months if no loss had occurred." (Def.'s SUMF, ECF No. 31-1 ¶ 29). The Matson CPA testified at his deposition that he did not recall reviewing the Policy. (*See* Markowicz Dep., Ex. I to Buscemi Decl., ECF No. 38-2 at 649). The CPA testified that the Policy was included in the job file forwarded by MJC to Matson. (*See* Markowicz Dep., Ex. 44 to Ashley Decl., ECF No. 40-3 at 77). The CPA recited the correct definition of Business Income under the Policy as "net income plus continuing expenses" at his deposition. (Markowicz Dep., Ex. I to Buscemi Decl., ECF No. 38-2 at 652).

On July 16, 2018, Suncoast sent Travelers a second CBIZ report. On August 16, 2018, Matson provided a written report, concluding that "Airborne's projected business income loss for 12 months totals $496,704"—$69,107 more than the amount Travelers already paid. (Def.'s SUMF, ECF No. 31-1 ¶ 32). In calculating the amount of lost business

income, Matson subtracted depreciation as a saved operating expense. The Matson CPA testified at his deposition that he included military sales as part of the "total revenue projection" used to determine "growth rates" and calculate Airborne's lost business income. (Markowicz Dep., Ex. 44 to Ashley Decl., ECF No. 40-3 at 75). The Matson CPA testified that he used a lower growth rate to calculate the lost business income than CBIZ used. "Travelers issued an additional payment totaling $69,107 for Airborne's business income loss claim on August 22, 2018." (Def.'s SUMF, ECF No. 31-1 ¶ 34).

On November 7, 2018, Plaintiffs requested resolution of the business income loss portion of the Nose Cone Claim via appraisal, and Travelers agreed. The appraisal proceeding lasted several months. On July 31, 2019, the appraisers executed an Appraisal Award in the amount of $1,903,296—the remainder of the Policy's $2,400,000 business income loss limit. The Appraisal Award included lost military sales and did not subtract depreciation as a saved operating exsense. The Appraiser's Report states:

> Like CBIZ, I do not include any Military sales until January 2018 when, like CBIZ, I adopt the amount estimated in the Internal Projections. This may be conservative as Airborne appears to have reached an agreement in 2016 with the exclusive contractor for the US Navy Parachute Course that already contemplated approximately $21,000 in monthly revenue.
>
> . . .
>
> By far, the most material difference between the parties' views of expenses concerns the treatment of $67,500 in monthly depreciation charges . . . . [Matson] deducted depreciation in calculating loss of business income, viewing the depreciation charge as a saved expense with equipment incurring less wear and tear while the business was interrupted, thus extending its useful life. CBIZ excluded depreciation in calculating loss of business income primarily because: (1) depreciation is a process of allocation, not of valuation, and (2) the deduction of depreciation in a los[t] income claim would violate the underlying concept of indemnity inherent in a business interruption insurance policy as the firm is worse off because the settlement payment is going to be less than the firm's operating cash flow has there been no incident . . . . Based on the evidence provided by CBIZ, and to avoid double-counting, depreciation is excluded from the calculation of loss of business income.

(Appraiser's Report, Ex. 147 to Litke Dep., ECF No. 32-2 at 335-36). "Travelers timely paid the Appraisal Award on August 12, 2019." (*Id.* ¶ 38).

Unreasonable conduct by an insurer includes purposefully delaying payment of a claim, *Richardson v. Emp'rs Liab. Assurance Corp.*, 25 Cal. App. 3d 232, 239 (1972), *overruled on other grounds by Gruenberg*, 9 Cal. 3d 566, and dilatory processing of a claim, *Fleming v. Safeco Ins. Co.*, 160 Cal. App. 3d 31, 37 (1984). It is undisputed that approximately one year elapsed between the date Airborne tendered the Nose Cone Claim and the date Travelers issued its first payment on the business income loss portion of the Nose Cone Claim. Both sides have come forward with evidence showing that the other was responsible for the delay. Viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that Travelers had sufficient information in August 2017 to determine Airborne's projected business income and that the failure to advance or pay Policy benefits until June 2018 was unreasonable. *See McCormick v. Sentinel Life Ins. Co.*, 153 Cal. App. 3d 1030, 1050-51 (1984) ("[A] lengthy delay in resolving a claim for insurance benefits will have the identical consequence for the insured as an outright denial of benefits . . . . [A]n ultimate tender of benefits . . . does not defeat [a cause] of action for insurance bad faith . . . . Rather, it merely mitigates damages." (fourth and fifth alterations in original) (citation omitted)), *as modified on denial of reh'g* (Apr. 24, 1984).

Viewing the facts in the light most favorable to Travelers, a reasonable jury could conclude that Travelers did not receive the information from Plaintiffs that it needed to determine Airborne's lost business income until April 2018, after which MJC promptly submitted its report and Travelers issued payment. *See Globe Indem. Co. v. Superior Court*, 6 Cal. App. 4th 725, 731 (1992) ("There can be no 'unreasonable delay' until the insurer receives adequate information to process the claim and reach an agreement with the insureds."), *as modified* (May 20, 1992).

The genuine dispute doctrine precludes bad faith liability for an insurer's delay in payment of policy benefits because of "a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim . . . ." *Wilson v. 21st*

*Century Ins. Co.*, 42 Cal. 4th 713, 723 (2007), *modified by* 2007 Cal. LEXIS 14848 (Dec. 19, 2007), 2007 Cal. LEXIS 14292 (Dec. 19, 2007), and 2007 Cal. LEXIS 14452 (Dec. 19, 2007); *see Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1280-81 (1994) ("[T]he mistaken withholding of policy benefits, if reasonable or if based on a legitimate dispute as to the insurer's liability under California law, does not expose the insurer to bad faith liability." (citation omitted)). The parties disputed the amount of lost business income payable under the Policy between June 18, 2018, when Travelers issued the first payment on the business loss portion of the Nose Cone Claim, and July 31, 2019, when the appraisal proceeding ended. However, a reasonable jury could conclude that the initial delay between June 29, 2017, when Airborne tendered the Nose Cone Claim, and June 18, 2018, when Travelers issued the first payment on the lost business income portion of the Nose Cone Claim, was unreasonable. The Court cannot conclude that the genuine dispute doctrine precludes liability for bad faith as a matter of law.

Unreasonable conduct by an insurer further includes failing to thoroughly investigate a claim, *Shade Foods, Inc. v. Innovative Prods. Sales & Mktg. Inc.*, 78 Cal. App. 4th 847, 879 (2000), *modified on denial of reh'g*, 2000 Cal. App. LEXIS 230 (Mar. 29, 2000), and unduly restrictive or arbitrary interpretation of policy terms, *Delgado v. Heritage Life Ins. Co.*, 157 Cal. App. 3d 262, 277 (1984), *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1163 (9th Cir. 2002). The parties' dispute over the amount of lost business income centered on the differences between MJC and Matson's handling of depreciation and military sales and CBIZ's handling of depreciation and military sales. "The 'genuine dispute' doctrine may be applied where the insurer denies a claim based on the opinions of experts." *Fraley v. Allstate Ins. Co.*, 81 Cal. App. 4th 1282, 1292 (2000). However, "[t]he genuine dispute doctrine 'does not relieve an insurer of its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim.'" *Paslay v. State Farm Gen. Ins. Co.*, 248 Cal. App. 4th 639, 653 (2016) (quoting *Wilson*, 42 Cal. 4th at 723).

Viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that Travelers failed to thoroughly and fairly investigate, process, and evaluate

the lost income portion of the Nose Cone Claim. *See Amadeo*, 290 F.3d at 1163 ("Arbitrary interpretation of insurance contracts is the antithesis of the reasonable dealing required by the covenant of good faith."); *see also Mariscal v. Old Republic Life Ins. Co.*, 42 Cal. App. 4th 1617, 1624 (1996) ("An insurance company may not ignore evidence which supports coverage. If it does so, it acts unreasonably towards its insured and breaches the covenant of good faith and fair dealing."). A reasonable jury could conclude that Travelers' reliance on its forensic accountants did not cure its failure to thoroughly and fairly investigate, process, and evaluate the lost income portion of the Nose Cone Claim.

Viewing the facts in the light most favorable to Travelers, a reasonable jury could conclude that Travelers thoroughly and fairly investigated, processed, and evaluated the lost income portion of the Nose Cone Claim. *See Paulson v. State Farm Mut. Auto. Ins. Co.*, 867 F. Supp. 911, 919 (C.D. Cal. 1994) ("The fact that State Farm changed its initial position and that the arbitrator subsequently found that State Farm owed Paulson the limit of his policy does not imply that State Farm acted in bad faith in the first instance."); *see also Shade Foods*, 78 Cal. App. 4th 880 (a "willingness to reconsider its [initial determination] of coverage and to continue an investigation into a claim . . . weigh[s] in favor of its good faith" (quoting *Blake v. Aetna Life Ins. Co.*, 99 Cal. App. 3d 901, 922 (1979))). A reasonable jury could conclude that Travelers reasonably relied on its accounting experts in evaluating the business income loss portion of the Nose Cone Claim.

Travelers' Motion for Summary Judgment on the second claim for breach of the implied covenant of good faith and fair dealing is denied. Travelers' Motion for Partial Summary Judgment on the grounds that Travelers is not liable for bad faith with respect to its handling of the Turning Vane Claim is granted. Travelers' Motion for Partial Summary Judgment on the grounds that Travelers is not liable for bad faith with respect to its handling of the Nose Cone Claim because there was a genuine issue as the amount of lost business income recoverable is denied. Plaintiffs' Motion for Partial Summary Judgment on the grounds that Travelers is liable for bad faith as a matter of law because it failed to thoroughly and objectively evaluate the Nose Cone Claim is denied. Plaintiffs' Motion for

1  Partial Summary Judgment on the grounds that the genuine dispute doctrine is
2  "unavailable" for Travelers' handling of the Nose Cone Claim is denied. (ECF No. 38 at
3  2).

4        **c.  <u>Punitive Damages</u>**

5        Travelers contends that Plaintiffs fail to come forward with clear and convincing
6  evidence sufficient to recover punitive damages on Travelers' handling of the Turning
7  Vane Claim or the Nose Cone Claim. Travelers contends that no reasonable jury could
8  conclude that Travelers is guilty of oppression, fraud, or malice. Plaintiffs contend that the
9  evidence presented is sufficient to support a claim for punitive damages.

10        "Punitive damages are available if in addition to proving a breach of the implied
11  covenant of good faith and fair dealing proximately causing actual damages, the insured
12  proves by clear and convincing evidence that the insurance company itself engaged in
13  conduct that is oppressive, fraudulent, or malicious." *Amadeo*, 290 F.3d at 1164 (citations
14  omitted). Punitive damages must be proven by clear and convincing evidence. *See Jordan,*
15  148 Cal. App. 4th at 1080 ("In other words, it will not be enough to show, by a
16  preponderance of the evidence, that Allstate had engaged in bad faith claims handling
17  practices. Jordan, in order to recover punitive damages, must also demonstrate by clear and
18  convincing evidence that Allstate acted with malice, oppression or fraud . . . .").

19        Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that
20  Plaintiffs have not come forward with evidence that would allow a jury to find by clear and
21  convincing evidence that Travelers engaged in oppressive, fraudulent, or malicious
22  conduct. Even if a jury determined that Travelers' actions were unreasonable and in bad
23  faith, "[t]here was nothing done [ ] which could be described as evil, criminal, recklessly
24  indifferent to the rights of the insured, or with a vexatious intention to injure." *Tomaselli*,
25  25 Cal. App. 4th at 1288. Travelers' Motion for Partial Summary Judgment on Plaintiffs'
26  claim for punitive damages with respect to the Turning Vane Claim is denied as moot.
27  Travelers' Motion for Partial Summary Judgment on Plaintiffs' claim for punitive damages
28  with respect to the Nose Cone Claim is granted.

1

**VI.   CONCLUSION**

2    IT IS HEREBY ORDERED that the Motion for Summary Judgment, or

3  Alternatively, Partial Summary Judgment filed by Defendant Travelers Property Casualty

4  Company of America (ECF No. 31) is granted in part and denied in part as stated herein.

5    IT IS FURTHER ORDERED that the Motion for Partial Summary Judgment filed

6  by Plaintiffs Airborne San Diego, LLC, and Suncoast Financial Mortgage Corporation

7  (ECF No. 38) is denied.

8   Dated:  May 10, 2021

9                                   Hon. William Q. Hayes
                                    United States District Court
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28